1  Steven R. Disharoon (State Bar No. 273170)
   sdisharoon@wshblaw.com
2  Michael A. Vasquez (State Bar No. 119045)
   mvasquez@wshblaw.com
3  Wood, Smith, Henning & Berman LLP
   1401 Willow Pass Road, Suite 700
4  Concord, California 94520-7982
   Phone: 925 222 3400 ♦ Fax: 925 356 8250
5
   Attorneys for Defendant and Third-Party Plaintiff UBER TECHNOLOGIES, INC.
6

**FILED**

Nov 03 2020

SUSAN Y. SOONG
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO

7

8                 **UNITED STATES DISTRICT COURT**

9      **NORTHERN DISTRICT OF CALIFORNIA, SAN FRANCISCO DIVISION**

10                                          CV 20-7749 JSC

11  JANE DOE,                        Case No. 3:19-cv-03310-JSC

12          Plaintiff,               **UBER TECHNOLOGIES, INC.'S THIRD-PARTY COMPLAINT**

13      v.                           **DEMAND FOR JURY TRIAL**

14  UBER TECHNOLOGIES, INC., et al.  The Hon. Jacqueline S. Corley

15          Defendant.               Trial Date:        None Set

16  _____

    UBER TECHNOLOGIES, INC.,
17
            Third-Party Plaintiff,
18
        v.
19
    BRANDON SHERMAN,
20
            Third-Party Defendant.
21
22

23

24          COMES NOW, Third-Party Plaintiff UBER TECHNOLOGIES, INC. ("Uber"), and for

25  causes of action against Third-Party Defendant BRANDON SHERMAN ("Sherman"), an

26  individual, complains and alleges as follows:

27                              **PARTIES**

28          1.      Uber is, and at all times relevant herein was, a business entity authorized to do

WOOD, SMITH, HENNING & BERMAN LLP
Attorneys at Law
1401 WILLOW PASS ROAD, SUITE 700
CONCORD, CALIFORNIA 94520-7982
TELEPHONE 925 222 3400 ♦ FAX 925 356 8250

1  business in the State of California.

2      2.      Uber is informed and believes and, based upon such information and belief, alleges

3  that at all times relevant herein, Sherman was an individual residing, and/or committing the

4  wrongful acts herein alleged, in the County of San Mateo, State of California.

5      3.      Uber is informed and believes and, based upon such information and belief, alleges

6  that Sherman is in some manner legally responsible for the acts and omissions alleged herein, and

7  in the underlying action at issue herein brought by Plaintiff Jane Doe ("Plaintiff"), discussed

8  further below, and actually and proximately caused and contributed to the various injuries and

9  damages alleged by Plaintiff in that action.

10                    **JURISDICTION AND VENUE**

11      4.      The existing jurisdiction and venue of this case is proper for this Third-Party

12  Complaint pursuant to Rule 14 of the Federal Rules of Civil Procedure in that it asserts claims

13  against Sherman, not currently a party to the action, who is liable to Uber for the claims being

14  asserted against it by Plaintiff.

15                    **GENERAL ALLEGATIONS**

16      5.      On June 12, 2019, Plaintiff filed the original complaint in this matter, entitled Jane

17  Doe v. Uber Technologies, Inc., et al., in the United States District Court for the Northern District

18  of California, San Francisco Division, Case No. 3:19-cv-03310-LSC (the "Underlying Action").

19      6.      In the Underlying Action, Plaintiff seeks damages and other relief based on an

20  alleged sexual assault occurring on or about August 14, 2018, after she got into a car driven by

21  Sherman because his car allegedly displayed Uber's trade dress, namely, a decal that bore the

22  word mark "UBER."  Plaintiff claims she mistakenly believed the car driven by Sherman was the

23  Uber X ride her fiancé, who was not with Plaintiff, had summoned for her on his Uber App.  As

24  Plaintiff's Complaint acknowledges, at the time of the assault, Sherman was not authorized by

25  Uber to use its App, as months before the assault Uber suspended his right to use the Uber App.

26      7.      A true and correct copy of the operative First Amended Complaint ("Complaint")

27  at issue in the Underlying Action is attached hereto as **Exhibit "A"** and incorporated herein by

28  reference as though fully set forth herein.  The Underlying Action is hereby referred to and

WOOD, SMITH, HENNING & BERMAN LLP
Attorneys at Law
1401 WILLOW PASS ROAD, SUITE 700
CONCORD, CALIFORNIA 94520-7982
TELEPHONE 925 222 3400 ♦ FAX 925 356 8250

1  incorporated by reference for the limited purposes of providing the background for this Third-

2  Party Complaint and for setting forth the nature and propriety of Uber's claims against Sherman.

3        8.     As outlined in more detail in its other pleadings in this matter, Uber denies that it

4  was negligent, careless, or engaged in any other tortious or wrongful conduct, and further denies

5  that it is liable under any theory alleged in Plaintiffs' Complaint or under any theory whatsoever,

6  for the damages and/or injuries alleged by Plaintiff.

7        9.     Uber denies the allegations in Plaintiff's Complaint, and, without admitting to the

8  allegations contained therein, if it is found that Uber is liable for any alleged damage to Plaintiff,

9  then Uber is informed and believes, and based thereon alleges, that such damage was primarily

10  and ultimately caused by the acts, breaches, and/or omissions of Sherman, whereas Uber's acts, if

11  any, were secondary, passive, or derivative in nature.

12        10.    Sherman conducted himself in an intentional, careless, reckless, criminal, and

13  negligent manner so as to cause the incident alleged in Plaintiff's Complaint.  As such, Uber

14  pursues from Sherman indemnity and/or equitable contribution and/or reimbursement of defense

15  fees and costs, and other relief, as detailed herein.

16            **FIRST CAUSE OF ACTION**

17            **(Equitable Indemnity)**

18        11.    Uber refers to and incorporates herein by reference each and every allegation

19  contained in the preceding paragraphs of this pleading as though fully set forth herein.

20        12.    In equity and good conscience, if Plaintiff recovers against Uber, Uber is entitled to

21  equitable indemnity, apportionment of liability, and contribution from Sherman according to his

22  amount of fault in this matter, for the injuries and damages claimed by Plaintiff, by way of sums

23  paid by settlement, or in the alternative, any judgment rendered against Uber in the action herein

24  based upon Plaintiff's Complaint.

25        13.    Uber expressly denies the allegations of the Complaint and any wrongdoing on its

26  part.  Should Uber nevertheless be found liable to Plaintiff on any of the claims asserted in the

27  Complaint or any other alleged wrongdoings with respect to the allegations of the Complaint, the

28  acts and/or omissions of Uber were passive and secondary, while those of Sherman were active,

WOOD, SMITH, HENNING & BERMAN LLP
Attorneys at Law
1401 WILLOW PASS ROAD, SUITE 700
CONCORD, CALIFORNIA 94520-7982
TELEPHONE 925.222.3400 ♦ FAX 925.356.8250

1    primary, and superseding.

2        14.    Thus, as a direct, proximate, and foreseeable result of the wrongdoing of Sherman,

3    Uber is entitled to total equitable indemnity from any and all liability adjudged against it.

4        15.    Moreover, as a direct, proximate and foreseeable result of the filing of the

5    Complaint, Uber has been compelled to incur attorneys' fees, court costs, and the expense of this

6    Third-Party action, and Uber asserts that the same are or will be recoverable, in whole or in part,

7    as damages on this Third-Party Complaint against Sherman.

8        16.    Further, should Plaintiff recover any amount of damages against Uber by way of

9    judgment, settlement, or otherwise, then Uber, by reason of the foregoing and in equity and good

10   conscience, is entitled to an equitable apportionment of the liability of Sherman, on a comparative

11   fault basis and a judgment against Sherman accordingly under the doctrine of equitable indemnity.

12   **<u>SECOND CAUSE OF ACTION</u>**

13   **(Contribution)**

14       17.    Uber refers to and incorporates herein by reference each and every allegation

15   contained in the preceding paragraphs of this pleading as though fully set forth herein.

16       18.    In the event that the trier of fact determines that Plaintiff is entitled to an award of

17   damages against Uber, and that Sherman is not completely liable for the same, Uber is entitled to

18   contribution (aka, partial indemnification) from Sherman, for that portion of the damages awarded

19   that is attributable to the percentage of comparative fault or negligence that is assessed or

20   assessable against Sherman, in addition to any other damages, costs, fees, or other losses suffered

21   by Uber and attributable to Sherman.

22   **<u>THIRD CAUSE OF ACTION</u>**

23   **(Declaratory Relief)**

24       19.    Uber refers to and incorporates herein by reference each and every allegation

25   contained in the preceding paragraphs of this pleading as though fully set forth herein.

26       20.    Uber herein asserts claims for relief against Sherman based on various legal and

27   equitable theories.

28       21.    Uber is informed and believes, and based thereon alleges, that it has suffered

WOOD, SMITH, HENNING & BERMAN LLP
Attorneys at Law
1401 WILLOW PASS ROAD, SUITE 700
CONCORD, CALIFORNIA 94520-7982
TELEPHONE 925.222.3400 ♦ FAX 925.356.8250

WOOD, SMITH, HENNING & BERMAN LLP
Attorneys at Law
1401 WILLOW PASS ROAD, SUITE 700
CONCORD, CALIFORNIA 94520-7982
TELEPHONE 925.222.3400 ♦ FAX 925.356.8250

1   damages, losses, and other harm as a result of actions and/or inactions on the part of Sherman,

2   and/or as a result of his failure to comply with his legal and/or equitable obligations to Uber and/or

3   Plaintiff.

4         22.     Uber is informed and believes, and based thereon alleges, that a dispute has arisen

5   and an actual controversy now exists between Uber and Sherman, in that Uber contends that it is

6   entitled to indemnity, contribution, and/or other relief from Sherman, which Uber is informed and

7   believes is disputed by Sherman.

8         23.     Uber hereby seeks a Declaration by the Court as to the respective rights and duties

9   of Sherman and Uber with respect to the matters herein alleged, and a declaratory judgment in

10  Uber's favor as to any obligations by Sherman, including, without limitation, his duty to

11  indemnify Uber and provide reimbursement of litigation expenses incurred herein by Uber.

12        24.     Uber further requests declaratory relief from this Court in the form of a judicial

13  interpretation of the various equitable obligations alleged herein to be owed by Sherman to Uber.

14  **PRAYER FOR RELIEF**

15  WHEREFORE, Uber prays for judgment against Sherman as follows:

16  **FIRST CAUSE OF ACTION:**

17  1.     That Uber is entitled to equitable indemnity from Sherman;

18  **SECOND CAUSE OF ACTION:**

19  2.     That Uber is entitled to contribution from Sherman;

20  **THIRD CAUSE OF ACTION:**

21  3.     For a judgment declaring the rights, duties, obligations and liabilities of Uber and

22  Sherman;

23  **AS TO ALL CAUSES OF ACTION:**

24  4.     For a judgment that Sherman be required to indemnify Uber from any loss,

25  damage, costs, judgment, settlement, and expense, including, but not limited to, attorney's fees

26  and Court costs related to and/or connected with the claims asserted herein by Plaintiff;

27  5.     For costs of suit incurred herein;

28  6.     For attorney's fees as legally permitted;

1    7.    For such other and further relief as the Court may deem just and proper.

2    **<u>DEMAND FOR JURY TRIAL</u>**

3    Uber hereby demands a jury trial on its Third-Party Complaint.

4    DATED:  June 5, 2020                    WOOD, SMITH, HENNING & BERMAN LLP

5

6                                        By:    _/s/STEVEN R. DISHAROON_

7                                               STEVEN R. DISHAROON
                                                MICHAEL A. VASQUEZ
8                                               Attorneys for Uber Technologies, Inc., Rasier,
                                                LLC, and Rasier-CA, LLC
9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

WOOD, SMITH, HENNING & BERMAN LLP
Attorneys at Law
1401 WILLOW PASS ROAD, SUITE 700
CONCORD, CALIFORNIA 94520-7982
TELEPHONE 925.222.3400 ♦ FAX 925.356.8250

# EXHIBIT "A"

LAW OFFICES OF
**WALKUP, MELODIA, KELLY & SCHOENBERGER**
A PROFESSIONAL CORPORATION

650 CALIFORNIA STREET, 26ᵀᴴ FLOOR
SAN FRANCISCO, CALIFORNIA 94108-2615
T: (415) 981-7210 · F: (415) 391-6965

MATTHEW D. DAVIS (State Bar #141986)
mdavis@walkuplawoffice.com
SARA M. PETERS (State Bar #260610)
speters@walkuplawoffice.com
ANDREW P. McDEVITT (State Bar #271371)
amcdevitt@walkuplawoffice.com
**ATTORNEYS FOR PLAINTIFF JANE DOE**

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA, SAN FRANCISCO DIVISION

| | |
|---|---|
| JANE DOE, an individual using a pseudonym, | Case No. 19-cv-03310-JSC |
| Plaintiff, | **FIRST AMENDED COMPLAINT FOR DAMAGES** |
| v. | **DEMAND FOR JURY TRIAL** |
| UBER TECHNOLOGIES, INC., RASIER, LLC; RASIER CA, LLC, | |
| Defendant. | |

Plaintiff Jane Doe, by and through undersigned counsel Walkup, Melodia, Kelly & Schoenberger, A Professional Corporation, as her Complaint against Defendant Uber Technologies, Inc., Rasier, LLC, and Rasier-CA, LLC, hereby alleges as follows:

### PARTIES

1.      Jane Doe is a pseudonym and is not Plaintiff's real name. With her original complaint, Jane Doe submitted an application to the Court for an order permitting her to use a pseudonym on the ground that anonymity is necessary to prevent mental harm and to preserve privacy in a matter of a sensitive and highly personal nature.

2.       Plaintiff Jane Doe is an adult woman who is a citizen of Mexico.

3.       Defendant Uber Technologies, Inc. ("Uber Technologies") is a Delaware Corporation with its principal place of business in the City and County of San Francisco, State of California.

4.       Defendants Rasier, LLC and Rasier-CA, LLC (collectively "Rasier") are Delaware Limited Liability Companies with their principal places of business in the City and County of San Francisco, State of California.

5.       Defendants Uber Technologies, Inc., Rasier, LLC, and Rasier-CA, LLC (collectively "Uber" the "Company" or "Defendants") operate throughout the United States and internationally in approximately 555 cities, including the City of San Mateo in the County of San Mateo, State of California.

## JURISDICTION AND VENUE

6.       The jurisdiction of this action arises under diversity of citizenship pursuant to 28 U.S.C. § 1332. Plaintiff is a citizen of a foreign country. Defendants are all citizens of California. The amount in controversy exceeds $75,000, exclusive of interest and costs.

7.       The Court has personal jurisdiction over Defendants because Defendants are headquartered in San Francisco, California and conduct their business in California.

8.       Venue is proper as authorized pursuant to 28 U.S.C. § 1391(b)(1), as Defendant Uber Technologies Inc. is headquartered in, conducts business in, and resides in this district.

## FACTUAL ALLEGATIONS

9.       As recently as 2010, the general public considered it unreasonably dangerous for a young woman to get into a strange man's private car with the expectation that he would drive her to a specific location and let her get out of his car, unharmed. That would have been considered hitchhiking. A foreseeable risk of

LAW OFFICES OF
WALKUP, MELODIA, KELLY
& SCHOENBERGER
A PROFESSIONAL CORPORATION
650 CALIFORNIA STREET
26TH FLOOR
SAN FRANCISCO, CA  94108
(415) 981-7210

2

FIRST AMENDED COMPLAINT FOR DAMAGES - Case No. 19-cv-03310-JSC

1    hitchhiking was the potential for sexual assault.

2        10.    If someone needed a ride, one approach that had been considered

3    reasonably safe for many decades as of 2010 was to hail a licensed taxi. For decades,

4    local authorities have heavily regulated taxi drivers and taxicabs to provide

5    safeguards and protections for prospective passengers against unscrupulous or

6    predatory drivers.

7        11.    For example, currently in the City and County of San Francisco, an

8    applicant to become a taxi driver must: submit fingerprints that are checked against

9    the California DOJ "RAP Sheet" database; pass a written exam; complete a driver

10   training course; provide a recent photograph; submit to an alcohol and drug test;

11   receive a negative result on the alcohol and drug test; authorize the city to obtain the

12   results of past alcohol and drug tests: notify the city whether he or she has previously

13   failed an alcohol or drug test; be "clean in dress in person"; be free of any condition

14   that might render the applicant unsafe to operate a motor vehicle; have no prior

15   convictions of a crime that would present a risk to public safety; be at least 21; and

16   speak, read, and write the English language. San Francisco Transportation Code §

17   1103(c). A permitted taxi driver must conspicuously display his or her permit on the

18   outside of his or her clothing at all times while operating a taxi and show that permit

19   to any peace officer upon request. The permit can be worn only by the driver to whom

20   it is issued. Id. at § 1108(a).

21       12.    San Francisco also regulates taxicabs to make sure they clearly stand

22   out, and are easily identified and tracked. Taxicabs must be painted to conform to an

23   approved color scheme and bear a city-issued medallion with an identifying number.

24   Id. at §§ 1102, 1108, 1113(d), 113(6). Every San Francisco taxicab must have the

25   following information displayed on the exterior of the vehicle: the vehicle number; the

26   words "San Francisco Taxicab"; a decal indicating a satisfactory vehicle inspection;

27   the name of the taxi company; and the medallion. Id. These safeguards make every

28   taxicab identifiable and trackable, and thus minimize the chances that a taxi driver

LAW OFFICES OF
WALKUP, MELODIA, KELLY
& SCHOENBERGER
A PROFESSIONAL CORPORATION
650 CALIFORNIA STREET
26TH FLOOR
SAN FRANCISCO, CA  94108
(415) 981-7210

3

FIRST AMENDED COMPLAINT FOR DAMAGES - Case No. 19-cv-03310-JSC

1    would rob, assault, or take advantage of a passenger, or that someone might

2    masquerade as a taxi driver and victimize a passenger. These safeguards also make

3    it easier for law enforcement officers to apprehend anyone who victimizes a

4    passenger while driving a taxi.

5         13.    Beginning in 2011 with its launch of "Uber X," Uber built a novel

6    "rideshare" industry. In order to build this industry, Uber had to both (1) change the

7    public's attitude toward getting into a stranger's private car such that there would be

8    demand for its rides, and (2) circumvent the taxi industry's existing safety

9    regulations in order to rapidly recruit a fleet of non-professional drivers to meet this

10   demand. To say that Uber ultimately succeeded would be an understatement. On

11   May 9, 2019, an initial public offering valued Uber at $82.4 billion.

12        14.    In order to disrupt the public's cautious attitude on the topic of getting

13   into a stranger's private car, Uber spent many millions of dollars marketing and

14   promoting the concept that its non-professional Uber X "rideshare" drivers, driving

15   unregulated, non-distinctive personal cars, can be summoned with the "Uber App"

16   and trusted to transport people safely.

17        15.    In order to create a large and ready supply of drivers, Uber leapfrogged

18   over safety regulations and laws that govern the transportation industry, and also

19   failed to take and implement reasonable measures to protect rideshare passengers

20   from unscrupulous, unqualified and dangerous drivers. The application process to

21   become an Uber X driver is simple, fast, and designed to allow the Company to hire

22   as many drivers as possible while incurring minimal associated costs. The cost and

23   time savings, however, come at the expense of the safety of Uber X passengers,

24   especially female riders.

25        16.    In contrast to the local regulations that impose background checks,

26   tests, and permit requirements on taxi drivers, Uber instead invited almost anyone

27   with a driver's license to become an Uber X driver. Uber even makes rental car

28   arrangements for those who do not own a car. To become an Uber X driver,

LAW OFFICES OF
WALKUP, MELODIA, KELLY
& SCHOENBERGER
A PROFESSIONAL CORPORATION
650 CALIFORNIA STREET
26TH FLOOR
SAN FRANCISCO, CA  94108
(415) 981-7210

4

FIRST AMENDED COMPLAINT FOR DAMAGES - Case No. 19-cv-03310-JSC

1  individuals apply through Uber's website.

2  17.   Uber generally outsources background checks of driver applicants to

3  third party vendors that do not perform stringent background checks. Those vendors

4  simply run potential drivers' social security numbers through databases similar to

5  those held by private credit agencies, which only go back for a period of seven years

6  and do not capture all arrests and/or convictions. The background checks conducted

7  by private companies for Uber do not require fingerprinting for comparison against

8  Department of Justice and Federal Bureau of Investigation databases. Neither Uber

9  nor its third party vendors verify that the information provided by applicants is

10  accurate or complete. The turnaround time for an Uber background check is often

11  under 36 hours.

12  18.   Using traditional lobbying efforts as well as its own social media clout,

13  Uber lobbies state and local governments, including in California, to adopt its own

14  proposed "model" regulations, which allow it to conduct its own background checks,

15  instead of more stringent regulations like those used for taxi drivers. In Austin,

16  Texas, where regulators imposed fingerprint background checks, Uber punished the

17  regulators by pulling out of the city altogether.

18  19.   As a direct result of Uber's lobbying efforts and social media campaigns,

19  the Company largely self-enforces hiring standards for its Uber X drivers.

20  20.   Uber is and has been aware that its security screening processes are

21  insufficient to prevent unsafe applicants from successfully registering as Uber X

22  drivers. Its inadequate background checks have been the subject of a number of

23  municipal lawsuits and fines.

24  21.   In 2015 the District Attorneys of San Francisco and Los Angeles filed a

25  complaint alleging that individuals who passed Uber's security screening process and

26  were found driving for Uber had the following felony convictions: second degree

27  murder; lewd and lascivious acts against a child under the age of 14; sexual

28  exploitation of children; kidnapping for ransom with a firearm; assault with a

LAW OFFICES OF
WALKUP, MELODIA, KELLY
& SCHOENBERGER
A PROFESSIONAL CORPORATION
650 CALIFORNIA STREET
26TH FLOOR
SAN FRANCISCO, CA 94108
(415) 981-7210

5

FIRST AMENDED COMPLAINT FOR DAMAGES - Case No. 19-cv-03310-JSC

1   firearm; grand theft; robber; identity theft; burglary; and taking a vehicle without

2   consent. In connection with the litigation, the San Francisco District Attorney called

3   background checks without fingerprinting "completely worthless."

4        22.    Where cities and states (such as Houston and Maryland) perform their

5   own fingerprint-based background checks, numerous driver applicants approved by

6   Uber are ultimately rejected. In Maryland, nearly 15 percent of new rideshare

7   drivers are disqualified for failing the state's background checks. In 2017, when

8   Massachusetts began running its own background checks on Uber and Lyft rideshare

9   drivers, the state rejected 20,000 out of 170,000 rideshare driver applications that

10  had been approved by the companies. Of those, 3,471 were rejected due to violent

11  crimes.

12       23.    In addition to relaxed driver background check standards, Uber also

13  operates with almost no standards to ensure that Uber X vehicles stand out and are

14  easily tracked. In contrast to the local regulations that impose color-scheme and

15  medallion requirements making each taxicab distinct and easily traced, Uber devised

16  a system whereby Uber vehicles are distinguished from other vehicles only by an

17  Uber decal that the Uber X driver places in the car's window. Uber made its Uber

18  decals easy to obtain so that it could quickly recruit a large numbers of new Uber X

19  drivers, who would drive their own non-distinctive vehicles.

20       24.    Uber intends the Uber decal to reassure the prospective passenger:

21  "This is not just a random stranger's car. It is an Uber X and it is safe to get in."

22       25.    Uber owns several trademark registrations for "UBER" and several

23  Uber-based marks. It has used Uber as a trademark and trade name in connection

24  with goods and services since 2010. In opposing applications submitted by others to

25  the United States Patent and Trademark Office that contain some form of the word

26  "uber", Uber has stated that through its "marketing, promotion, advertising, and

27  commercial activity, the public readily associates the UBER Marks and Names with

28  Uber and its goods and services. The UBER Marks and Names are thus valuable

LAW OFFICES OF
WALKUP, MELODIA, KELLY
& SCHOENBERGER
A PROFESSIONAL CORPORATION
650 CALIFORNIA STREET
26TH FLOOR
SAN FRANCISCO, CA 94108
(415) 981-7210

6

FIRST AMENDED COMPLAINT FOR DAMAGES - Case No. 19-cv-03310-JSC

1   assets of Uber and symbols of its goodwill."[1]

2       26.    Uber knows that the general public understands the use of its UBER

3   decal on a vehicle to mean that the driver is working for Uber, and that Uber has

4   vetted the driver and is certifying that the driver is a safe driver who will provide a

5   safe ride. Further, Uber intends for the use of its UBER decal on a vehicle to signify

6   these things (that the driver is working for Uber, and that Uber certifies the driver

7   as a safe driver). Uber advertises and markets its trademark, decal, and safety record

8   in a manner designed to cause the public to believe these things.

9       27.    In opposing applications submitted by others to the United States

10  Patent and Trademark Office that contain some form of the word "uber", Uber has

11  argued that allowing a person or company, which is not associated with Uber, to use

12  the word "uber" in a trademark name is "likely to falsely suggest a connection

13  between [the unaffiliated person or company] and Uber's trade name and identity

14  because [a trademark containing the word "uber"] is confusingly similar to and would

15  be recognized as an approximation of the same. Even more, the fame and reputation

16  of Uber is of such a nature that a connection with Uber would be presumed when [the

17  unaffiliated person or company] uses [a trademark containing the word uber] in

18  connection with its services."[2] Uber has further argued that "[a trademark containing

19  the word "uber"] uniquely and unmistakably points to Uber's famous name and

20  identity."[3]

21      28.    Trademarks and service marks are recognized to function both as an

---

[1] Notice of Opposition submitted by Uber Technologies, Inc. in In the matter of Trademark App. Ser. No. 88/149861 at ¶ 13; *see also* Notice of Opposition submitted by Uber Technologies, Inc. in In the matter of Trademark App. Ser. No. 87776977 at ¶ 13 & Notice of Opposition submitted by Uber Technologies, Inc. in In the matter of Trademark App. Ser. No. 87/490138 at ¶ 14.

[2] Notice of Opposition filed by Uber Technologies, Inc. in In the matter of Trademark App. Ser. No. 88/149861 at ¶ 15; *see also* Notice of Opposition submitted by Uber Technologies, Inc. in In the matter of Trademark App. Ser. No. 87776977 at ¶ 15 & Notice of Opposition submitted by Uber Technologies, Inc. in In the matter of Trademark App. Ser. No. 87/490138 at ¶ 16.

[3] *Id.*

LAW OFFICES OF
WALKUP, MELODIA, KELLY
& SCHOENBERGER
A PROFESSIONAL CORPORATION
650 CALIFORNIA STREET
26TH FLOOR
SAN FRANCISCO, CA  94108
(415) 981-7210

FIRST AMENDED COMPLAINT FOR DAMAGES - Case No. 19-cv-03310-JSC

1  indication of origin or ownership and to serve as a guarantee of constancy of the

2  quality or other characteristics of a product or service.

3      29.    Uber presents vehicles bearing the UBER decal to customers as "a ride

4  you can trust."

5      30.    Uber has stated on its website that:

6          Wherever you are around the world, Uber is
           committed to connecting you to the safest ride on the
7          road. That means setting the strictest standards
           possible, and then working hard to improve them
8          every day. The specifics vary depending what local
           governments allow, but within each city we operate,
9          we aim to go above and beyond local requirements to
           ensure your comfort and security – what we are
10         doing in the US is an example of our standards
           around the world.
11

12     31.    Uber has stated on its website that:

13         From the moment you request a ride to the moment
           you arrive, the Uber experience has been designed
14         from the ground up with your safety in mind.

15     32.    Uber has actively fostered and successfully cultivated an image among

16  its customers of safety and superiority to public transportation and traditional taxis

17  – which is reflected in the very name of the Company itself.[4]

18     33.    Until as recently as October 2014, Uber represented that "Every

19  ridesharing and livery driver is thoroughly screened through a rigorous

20  process we've developed using industry-leading standards. This includes a

21  three step criminal background screening for the U.S. – with country, federal

22  and multi-state checks that go back as far as the law allows –and ongoing

23  reviews of drivers' motor vehicle records throughout their time on Uber."

24     34.    Until at least June 2, 2015, Uber's website stated: "Wherever you

25  are around the world, Uber is committed to connecting you to the safest ride on

26

27  ─────────────────────

28  [4] Dictionary.com defines "uber" as "designating a person or thing that exceeds the
    norms or limits of its kind or class."

LAW OFFICES OF
WALKUP, MELODIA, KELLY
& SCHOENBERGER
A PROFESSIONAL CORPORATION
650 CALIFORNIA STREET
26TH FLOOR
SAN FRANCISCO, CA 94108
(415) 981-7210

8

FIRST AMENDED COMPLAINT FOR DAMAGES - Case No. 19-cv-03310-JSC

the road. That means setting the strictest safety standards possible, then working hard to improve them every day." Uber's blog also trumpeted: "We'll continue innovating, refining, and working diligently to ensure we're doing everything we can to make Uber the safest experience on the road."

35.    Uber particularly markets itself as a safer transportation alternative for women. Uber's website and marketing contains numerous pictures of smiling women entering and exiting vehicles, who are meant to appear "safe." Five true and correct examples of Uber's marketing copy are reprinted below:



RIDE > SAFETY

Trip safety
Our commitment to riders

Uber is dedicated to keeping people safe on the road. Our technology enables us to focus on rider safety before, during, and after every trip.

/ / / /

/ / / /

/ / / /

/ / / /

/ / / /

/ / / /

/ / / /

LAW OFFICES OF
WALKUP, MELODIA, KELLY
& SCHOENBERGER
A PROFESSIONAL CORPORATION
650 CALIFORNIA STREET
26TH FLOOR
SAN FRANCISCO, CA  94108
(415) 981-7210

9

FIRST AMENDED COMPLAINT FOR DAMAGES - Case No. 19-cv-03310-JSC

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23



24  / / / /
25  / / / /
26  / / / /
27  / / / /
28  / / / /

LAW OFFICES OF
WALKUP, MELODIA, KELLY
& SCHOENBERGER
A PROFESSIONAL CORPORATION
650 CALIFORNIA STREET
26TH FLOOR
SAN FRANCISCO, CA  94108
(415) 981-7210

10

FIRST AMENDED COMPLAINT FOR DAMAGES - Case No. 19-cv-03310-JSC



36.    Uber intends the public to believe that a vehicle bearing an Uber decal is a "ride you can trust," and that its driver has passed the "strictest standards possible" in terms of background checks.

37.    Uber uses its decal as the way it confers its reputation and its safety certification upon a particular driver and ride.

38.    Uber's advertising and marketing representations have been successful, and at all relevant times members of the public, including Plaintiff Jane Doe, relied on the Uber decal on a vehicle as signifying that the driver is working for Uber, the trademark owner, and that the driver has been vetted and certified as safe by Uber.

39.    At all relevant times, Uber dispensed Uber decals, adorned with its immediately recognizable name and/or trademarked symbol, liberally and with little or no control.

40.    Uber even makes available a "temporary decal" for new drivers to print at home. This decal is publicly available at the website https://image.et.uber.com/lib/fe9112737763017e71/m/1/Uber-decal_print-at-home.png as of June 10, 2019, and is accessed via a public link stating "Need a temporary decal? Print one at home here." There is no security whatsoever to prevent anyone

LAW OFFICES OF
WALKUP, MELODIA, KELLY
& SCHOENBERGER
A PROFESSIONAL CORPORATION
650 CALIFORNIA STREET
26TH FLOOR
SAN FRANCISCO, CA 94108
(415) 981-7210

11

FIRST AMENDED COMPLAINT FOR DAMAGES - Case No. 19-cv-03310-JSC

1   from printing this decal and displaying it in any vehicle.

2        41.    At all relevant times, Uber did not even attempt to retrieve its Uber

3   decals from former Uber drivers who proved to be unsafe.

4        42.    In the San Francisco Bay Area alone, tens of thousands of cars bear

5   Uber decals. No one, not even Uber, knows how many vehicles display an Uber decal,

6   let alone which specific vehicles bear such a decal.

7        43.    At all relevant times, members of the public, including Plaintiff Jane

8   Doe, did not know that Uber exercises little control over its Uber decals, nor that the

9   presence of an Uber decal on a vehicle is essentially meaningless.

10        44.    Uber knew or should have known that the public was unaware of its lax

11   control over its decals. Nevertheless, at all relevant times, Uber took no steps to

12   inform the public of its lax control, or of the fact that the decal was unreliable as an

13   indicator of employment status or safety.

14        45.    Uber has known for years that criminals and sexual predators take

15   advantage of its weak driver screening process and uncontrolled Uber decal system.

16   Soon after launching Uber X, Uber began receiving reports of victims who were

17   assaulted, raped, robbed, or otherwise victimized after they willingly got into a car

18   because it displayed an Uber decal, including instances in which the assailant-driver

19   had not been hailed via the Uber App to pick up the victim-passenger.  On December

20   5, 2019, Uber released a report confirming that it received reports of the following

21   occurrences during Uber rides in the year 2018 alone: 235 rapes, 280 attempted

22   rapes, 1,560 groping incidents, 376 instances of unwanted kissing the breast,

23   buttocks, or mouth, and 594 reports of unwanted kissing to another body party. It

24   reported receiving a total of 5,981 reports of sexual assault between 201 and 2018.

25        46.    In sum, assaults and rape are a foreseeable risk of Uber's lax driver

26   screening process and Uber's uncontrolled distribution of Uber decals. Despite these

27   known deficiencies, Uber holds its brand and logo out to the public as representing

28   safety.

LAW OFFICES OF
WALKUP, MELODIA, KELLY
& SCHOENBERGER
A PROFESSIONAL CORPORATION
650 CALIFORNIA STREET
26TH FLOOR
SAN FRANCISCO, CA  94108
(415) 981-7210

12

FIRST AMENDED COMPLAINT FOR DAMAGES - Case No. 19-cv-03310-JSC

47.     Uber is a recognized technology innovator, but it nevertheless has failed to take technically feasible and reasonable measures to diminish and guard against this foreseeable harm to passengers caused by its uncontrolled distribution of Uber decals, because such safety measures would not only have added operating costs, but would have also hindered Uber's goal of recruiting as many Uber X drivers, driving their personal, non-distinctive vehicles, as possible in advance of Uber's IPO. Indeed, Uber has actively lobbied and instigated social media campaigns against laws that would regulate rideshare signage to protect against this very type of harm.

48.     There are some features built into the Uber App that, when used, can make the rides safer. When a person is riding in an Uber X vehicle summoned using that person's own Uber App, there are in-app features that allow the passenger to monitor the driver's location as the driver approaches the point of pickup. Under such circumstances, the passenger can also view, in the App, the make, model, and color of vehicle, as well as the license plate number and the driver's photo. Once the trip begins, there is a "panic button" in the app, as well as an option to "share trip status," and features that allow the passenger (or police, if necessary) to monitor the driver's location.

49.     Uber is and at all relevant times has been aware that its customers sometime summon Uber X cars for other people, and that under these circumstances the passenger does not typically have access to the App's features.

50.     Uber tracks the location of those who use its App, and Uber has the technological capability to block ride requests that attempt to summon a driver to pick up a passenger at a location remote from that of the person using the App.

51.     Uber not only permits its customers to summon rides for others by failing to block such requests, but it encourages them to do so and assures them that this is a safe and responsible practice. For example, Uber's website says, "Save the day. Grandma doesn't have a smartphone? Mom needs a ride from the airport? Your friend got a little too happy at happy hour? Send them a reliable ride to their

LAW OFFICES OF
WALKUP, MELODIA, KELLY
& SCHOENBERGER
A PROFESSIONAL CORPORATION
650 CALIFORNIA STREET
26TH FLOOR
SAN FRANCISCO, CA 94108
(415) 981-7210

13

FIRST AMENDED COMPLAINT FOR DAMAGES - Case No. 19-cv-03310-JSC

1  destination. It's always appreciated." https://www.uber.com/ride/how-uber-

2  works/request-for-a-guest/

3      52.     By encouraging its customers to summon rides for others, and making

4  this an acceptable way to use its service, Uber further emphasizes and advertises the

5  rider's reliance on the Uber decal as the means to determine that a given ride is a

6  provided by a safe, vetted, reliable Uber driver.

7      53.     Uber intentionally chose to expand its market share to include those

8  riders who do not have a working smart phone available, even though it knew that by

9  doing so it would be depriving those riders of the few safety mechanisms it otherwise

10 provides, and would cause those riders to rely on its unsafe decal system.

11     54.     Prior to Ms. Doe's incident, Uber intentionally chose not to advertise to

12 riders that, in order to protect themselves from dangerous drivers, they should

13 always verify the license plate and driver's appearance, using the App. Uber made

14 this choice in order to increase and retain its market share.

15     55.     Uber has at all relevant times failed to communicate to its customers

16 how lax its driver background check system is, how easy it is to acquire an Uber

17 decal, and how easy it is to impersonate an Uber X driver. In withholding this

18 information from its customers, Uber knowingly caused its customers to rely on the

19 Uber decals as signaling that a driver has been vetted by Uber and is trustworthy. In

20 withholding this information, Uber has also created the impression that the Uber

21 App's features that identify the driver and vehicle are there for convenience (to help

22 riders find the correct driver) as opposed to safety (to help riders find a safe driver).

23     56.     On August 14, 2018, Plaintiff Jane Doe, a young woman, voluntarily got

24 into the back seat of a strange man's car. That man (the "Assailant") activated the

25 childproof locks on the car's rear doors, trapping her inside. He drove to a remote

26 location, where he raped and partially strangled Jane Doe. The Assailant then

27 started driving to another location, where he planned to assault Jane Doe again and

28 probably kill her, but she escaped and was rescued by a passing motorist.

LAW OFFICES OF
WALKUP, MELODIA, KELLY
& SCHOENBERGER
A PROFESSIONAL CORPORATION
650 CALIFORNIA STREET
26TH FLOOR
SAN FRANCISCO, CA  94108
(415) 981-7210

14

FIRST AMENDED COMPLAINT FOR DAMAGES - Case No. 19-cv-03310-JSC

57.     The Assailant fled, but was identified and captured weeks later, only because the San Mateo Police Department conducted an exhaustive and superb investigation. As of the time of this complaint, the Assailant sits in jail and faces criminal charges that could lead to imprisonment for life.

58.     Jane Doe is not from the United States. She and her fiancé are from Mexico. Her fiancé had business in the Bay Area in the middle of August 2018. She flew to the region to spend a few days with him for a mini-vacation. It was in the middle of this trip, August 14, 2018, that the assault occurred.

59.     In the early evening of August 14, 2018, Jane Doe was at a shopping mall in San Mateo County, California. She wanted to return to the nearby hotel at which she and her fiancé were staying. Her own smartphone was running low on power. She therefore texted her fiancé, who was elsewhere, and asked that he use his Uber App to summon an Uber X ride for her. Her fiancé complied with her request. As described above, using the Uber App to summon a ride for someone else is a practice that Uber allows and encourages.

60.     There was an Uber decal on the windshield of a car that showed up at the location at which Jane Doe expected to be picked up. Jane Doe, whose primary language is not English, got into that car only because it had an Uber decal in the window and she believed, perhaps mistakenly, that the driver said her boyfriend's name when she neared the car.

61.     After Jane Doe overheard the driver say something and after she got into the back of the car, the driver looked in his rearview mirror and said "wow." On information and belief, before Jane Doe got into his vehicle, the driver did not know that Jane Doe was at the mall, was unaware that she was about to enter his car, and had not yet formed an intent to kidnap, assault, or rape her or anyone else. The driver slowed down outside the mall for unknown reasons. Because he appeared to be working for Uber, Jane Doe got into his car. On information and belief, when he looked in his rearview mirror, he said "wow" because he was pleased that an

LAW OFFICES OF
WALKUP, MELODIA, KELLY
& SCHOENBERGER
A PROFESSIONAL CORPORATION
650 CALIFORNIA STREET
26TH FLOOR
SAN FRANCISCO, CA  94108
(415) 981-7210

15

FIRST AMENDED COMPLAINT FOR DAMAGES - Case No. 19-cv-03310-JSC

1   attractive woman had gotten into his car, alone. On information and belief, this

2   excited the driver and caused him to form a desire and intent to kidnap and then

3   assault Ms. Doe.

4       62.    In sum, Jane Doe willingly got into the back of this strange man's car

5   because she believed that it was an Uber X rideshare and that it was safe to do so. As

6   alleged above, Uber purposefully disrupted and changed the public's attitudes about

7   riding in a stranger's private car, and it aggressively marketed the concept that it is

8   safe for a young woman to get into an Uber X car under the circumstances presented

9   to Jane Doe on the evening of August 14, 2018.

10      63.    Months before Jane Doe was assaulted, Uber learned that the Assailant

11  was a menace to women. He was, at that time, an Uber X driver, authorized by Uber

12  to use the Uber App. On or about June 8, 2018, a woman reported to the Company

13  that the Assailant behaved disturbingly while giving her an Uber X ride. Uber

14  "investigated" her complaint by interviewing the Assailant over the telephone. He

15  admitted to Uber that he drove the passenger off her "route", flirted with her, and

16  drove her to a "horse stable," ostensibly so they could "talk."

17      64.    Uber did suspend the Assailant's access to the Uber App after

18  interviewing that woman and the Assailant, but the Company did nothing more than

19  suspend access. It did not attempt to take back the Uber decal on his car or warn

20  others about him. Upon the Assailant's arrest months later for his terrifying attack

21  on Jane Doe, police observed an Uber decal on his car and found numerous Uber

22  decals in the Assailant's possession.

23      65.    Indeed, Uber was unable to put the genie it had created back in the

24  bottle. Uber had disseminated tens of thousands of Uber decals in the Bay Area alone

25  with no way of tracking them, let alone retrieving them from men like the Assailant

26  in this case, whom Uber knew, or had reason to suspect, were dangerous sexual

27  predators.

28      66.    Upon learning of another woman's complaint against its driver, Uber

LAW OFFICES OF
WALKUP, MELODIA, KELLY
& SCHOENBERGER
A PROFESSIONAL CORPORATION
650 CALIFORNIA STREET
26TH FLOOR
SAN FRANCISCO, CA  94108
(415) 981-7210

16
FIRST AMENDED COMPLAINT FOR DAMAGES - Case No. 19-cv-03310-JSC

did nothing to notify its main competitor, Lyft, of the Assailant's concerning behavior even though Uber was aware that many of its drivers concurrently drive for Lyft. As a result, the Assailant was continuing to offer rides through Lyft up until and even after he assaulted Plaintiff Jane Doe.

67.    It turns out that the Assailant had a significant criminal history that predated his driving for Uber, including convictions/arrests for driving under the influence of alcohol, driving on a suspended license, being under the influence of a controlled substance, possession of a controlled substance, vehicle theft, vandalism, assault/battery, and domestic violence. Nevertheless, Uber: "passed" him after a purported background check; provided him with Uber decals; gave him access to the Uber App; and permitted him to pick up Uber X passengers.

68.    Jane Doe is just one victim of Uber's lax rideshare system that so easily allows a predator to become an Uber X driver, or to masquerade as an Uber X driver even if he no longer has access to or is not using the Uber App.

69.    The attack on Jane Doe and other similar assaults by men who appeared to be rideshare drivers received significant public attention just before Uber's planned IPO. Rather than changing its ineffectual driver-vetting process and uncontrolled Uber decal scheme to more time-consuming and costly but safer systems, Uber instead responded to the negative publicity by blaming the victim-passenger. Uber also tried to shift the burden to the passenger to check and vet the Uber X driver who picks her up. On or about April 18, 2019, Uber rolled out new "safety features" (nothing more than text message prompts to passengers who are waiting for their Uber X to arrive). At that same time Tony West, Uber's chief legal and security officer, said, "It's become sort of second nature whenever we get into a car to buckle up. It has to be second nature before you get into a car to ask, 'Hey, who are you here to pick up?'" https://www.nbcnews.com/news/us-news/uber-unveils-new-safety-measures-wake-college-student-s-murder-n995611 For Plaintiff Jane Doe and many other past victims, this "fatherly advice" is too late. For the

LAW OFFICES OF
WALKUP, MELODIA, KELLY
& SCHOENBERGER
A PROFESSIONAL CORPORATION
650 CALIFORNIA STREET
26TH FLOOR
SAN FRANCISCO, CA  94108
(415) 981-7210

17

FIRST AMENDED COMPLAINT FOR DAMAGES - Case No. 19-cv-03310-JSC

1    future passenger-victims, this will be too little. Other Uber X passengers will get into

2    cars bearing Uber decals without cross-examining the driver for a variety of

3    foreseeable reasons, *e.g.*, hearing impairment, language barrier, intoxication,

4    youthful carelessness, residual trust in the brand Uber cultivated, or because they

5    heard the driver do or say something that they mistakenly interpret as indicating he

6    is the correct driver. Under Uber's current and flawed systems, the type of harm that

7    befell Plaintiff Jane Doe will happen over and over again.

8        70.    Uber purposefully made an end run around transportation safety laws

9    and regulations when it launched Uber X, such as those that regulate the taxi

10   industry. Uber failed to respond when the safety flaws in its Uber X rideshare

11   system, described above, came to the Company's attention. The Company could have

12   implemented reasonable and feasible remedial measures to prevent and guard

13   against such incidents. Uber instead chose profit (getting as many Uber drivers and

14   riders on the road as soon as possible in advance of its IPO) over safety

15   (implementing reasonable safeguards that would have added time and increased

16   costs). Such conduct is despicable and demonstrates a conscious disregard of the

17   safety and lives of prospective Uber X passengers like Plaintiff Jane Doe.

18

19                         **FIRST CAUSE OF ACTION**

20                  **(FALSE IMPRISONMENT BY OSTENSIBLE AGENT)**

21       71.    Plaintiff alleges and reasserts all the preceding paragraphs as if fully

22   set forth herein.

23       72.    Uber intentionally or carelessly created the impression that the man

24   who assaulted, battered and falsely imprisoned Jane Doe was Uber's employee or

25   agent.

26       73.     Jane Doe reasonably believed that the Assailant was Uber's employee

27   or agent and therefore got into his vehicle.

28       74.     As a result of Jane Doe getting into his vehicle, on her reliance on his

LAW OFFICES OF
WALKUP, MELODIA, KELLY
& SCHOENBERGER
A PROFESSIONAL CORPORATION
650 CALIFORNIA STREET
26TH FLOOR
SAN FRANCISCO, CA  94108
(415) 981-7210

18
FIRST AMENDED COMPLAINT FOR DAMAGES - Case No. 19-cv-03310-JSC

1    appearance of agency, Assailant formed the desire and intent to kidnap Jane Doe.

2          75.    Jane Doe was falsely imprisoned (kidnapped) because she reasonably

3    relied on her belief.

4          76.    As a direct and proximate result of the aforementioned conduct, Jane

5    Doe has sustained and will sustain physical pain, mental suffering, loss of enjoyment

6    of life, anxiety, humiliation, and emotional distress.

7          77.    As a direct and proximate result of the aforementioned conduct, Jane

8    Doe has incurred economic damages, including lost past and future income, lost

9    earning capacity, and past and future medical expenses.

10         78.    Accordingly, Jane Doe is entitled to recovery against Uber in an amount

11   to be determined at trial.

12   **SECOND CAUSE OF ACTION**

13   **(ASSAULT AND BATTERY BY OSTENSIBLE AGENT)**

14         79.    Plaintiff alleges and reasserts all the preceding paragraphs as if fully

15   set forth herein.

16         80.    Uber intentionally or carelessly created the impression that the man

17   who assaulted and battered Jane Doe was Uber's employee or agent.

18         81.    Jane Doe reasonably believed that the Assailant was Uber's employee

19   or agent and therefore got into his vehicle.

20         82.    As a result of Jane Doe getting into his vehicle, on her reliance on his

21   appearance of agency, Assailant formed the desire and intent to assault, batter, and

22   rape Jane Doe.

23         83.    Jane Doe was falsely imprisoned (kidnapped) and raped because she

24   reasonably relied on her belief.

25         84.    As a direct and proximate result of the aforementioned conduct, Jane

26   Doe has sustained and will sustain physical pain, mental suffering, loss of enjoyment

27   of life, anxiety, humiliation, and emotional distress.

28         85.    As a direct and proximate result of the aforementioned conduct, Jane

LAW OFFICES OF
**WALKUP, MELODIA, KELLY
& SCHOENBERGER**
A PROFESSIONAL CORPORATION
650 CALIFORNIA STREET
26TH FLOOR
SAN FRANCISCO, CA  94108
(415) 981-7210

19

FIRST AMENDED COMPLAINT FOR DAMAGES - Case No. 19-cv-03310-JSC

Doe has incurred economic damages, including lost past and future income, lost earning capacity, and past and future medical expenses.

86.     Accordingly, Jane Doe is entitled to recovery against Uber in an amount to be determined at trial.

## THIRD CAUSE OF ACTION
## (BREACH OF THE DUTY OF UTMOST CARE)

87.     Plaintiff alleges and reasserts all of the preceding paragraphs as if fully set forth herein.

88.     Uber was at all relevant times in the business of transporting the general public for profit, and held itself out to the public generally and indifferently for that purpose.

89.     Uber at all relevant times advertised its services to the general public.

90.     Uber at all relevant times charged standardized fees for its services, which were not separately negotiated with each passenger.

91.     In requesting that her fiancé summon an Uber ride for her, Jane Doe intended to become an Uber passenger.

92.     In encouraging customers to summon rides for others, and in accepting the ride request from Jane Doe's fiancé for a location Uber knew was remote from his location and thus must be for a person other than himself, Uber accepted Jane Doe as a passenger.

93.     In relying on Uber to send a driver to her location, and to provide trade dress visually identifying its driver, Jane Doe placed herself under Uber's control.

94.     Jane Doe went to the location designated as the site of departure at the appropriate time in an attempt to "board" her Uber ride using the manner and process prescribed by Uber.

95.      California Civil Code § 2100 thus obligated Uber to "use the utmost care and diligence for" Jane Doe's safe carriage, to "provide everything necessary for

LAW OFFICES OF
WALKUP, MELODIA, KELLY
& SCHOENBERGER
A PROFESSIONAL CORPORATION
650 CALIFORNIA STREET
26TH FLOOR
SAN FRANCISCO, CA  94108
(415) 981-7210

20

FIRST AMENDED COMPLAINT FOR DAMAGES - Case No. 19-cv-03310-JSC

1  that purpose," and to "exercise to that end a reasonable degree of skill," including

2  with respect to providing a safe place and manner for Jane Doe to locate her driver,

3  as well as providing a safe ride until she disembarked in a safe location.

4      96.    Uber negligently, and with gross negligence and recklessness, breached

5  the duty of utmost care that it owed to Jane Doe in that it:

6          a.  Undertook to provide riders, including Jane Doe, with a process and

7              set of tools for obtaining a safe ride, but negligently established an

8              unsafe process and unsafe set of tools, placing such riders at risk.

9          b.  Through its advertising, marketing, statements, processes, tools, and

10             silences, negligently held out drivers whose vehicles bore the UBER

11             decal as safe, vetted drivers working for Uber, whom Uber was

12             recommending and endorsing to its riders.

13         c.  Negligently created the appearance that it was recommending and

14             endorsing the Assailant, including by (1) making the UBER decal

15             seem a reliable indicator of safety, (2) failing to secure its UBER

16             decals generally, (3) providing UBER decals to the driver, and (4)

17             failing to specifically recall its UBER decals from the driver once he

18             proved to be dangerous.

19         d.  Failing to provide her with a safe process for entering the correct

20             vehicle.

21     97.    As a direct and proximate result of the aforementioned conduct and

22  breach of duty, Jane Does has sustained and will sustain physical pain, mental

23  suffering, loss of enjoyment of life, anxiety, humiliation, and emotional distress.

24     98.    As a direct and proximate result of the aforementioned conduct and

25  breach of duty, Jane Doe has incurred economic damages, including lost past and

26  future income, lost earning capacity, and past and future medical expenses.

27     99.    Accordingly, Jane Doe is entitled to recovery against Uber in an amount

28  to be determined at trial.

LAW OFFICES OF
WALKUP, MELODIA, KELLY
& SCHOENBERGER
A PROFESSIONAL CORPORATION
650 CALIFORNIA STREET
26TH FLOOR
SAN FRANCISCO, CA 94108
(415) 981-7210

21

FIRST AMENDED COMPLAINT FOR DAMAGES - Case No. 19-cv-03310-JSC

1

# **FOURTH CAUSE OF ACTION**

2

## **(NEGLIGENCE)**

3       100.    Plaintiff alleges and reasserts all of the preceding paragraphs as if fully

4   set forth herein.

5       101.    At all relevant times, Uber had a special relationship with Plaintiff Jane

6   Doe in that it held itself out as offering safe rides to the public, and it accepted her

7   ride request, agreed to provide her with a safe ride to her destination.

8       102.    Uber undertook to provide to Plaintiff Jane Doe a safe ride to her

9   destination. It undertook to provide her with a secure and safe process for obtaining

10  a safe ride. It undertook to recommend, certify, and identify for her a safe driver

11  whom she could trust.

12      103.    Jane Doe relied on Uber to provide her with a safe ride, to certify a safe

13  driver, and to provide her with a safe process matching her with the safe ride. She

14  thereby entrusted herself to Uber's care, and allowed Uber to take charge of her for

15  purposes of providing a safe ride to her destination. She gave up her normal power

16  and tools of self-protection (for example, not getting into a stranger's car) and relied

17  on Uber's process, recommendation, and certification.

18      104.    Uber negligently, and with gross negligence and recklessness, breached

19  the duty of care that it owed to Jane Doe in that it:

20              a.  Undertook to provide riders, including Jane Doe, with a process and

21                  set of tools for obtaining a safe ride, but instead negligently,

22                  recklessly, and knowingly established an unsafe process and unsafe

23                  set of tools, placing such riders at risk.

24              b.  Through its advertising, marketing, statements, processes, tools, and

25                  silences, negligently, recklessly, and knowingly held out drivers

26                  whose vehicles bore the UBER decal as safe, vetted drivers working

27                  for Uber, whom Uber was recommending, certifying, and endorsing

28                  to its riders as safe and trustworthy.

LAW OFFICES OF
WALKUP, MELODIA, KELLY
& SCHOENBERGER
A PROFESSIONAL CORPORATION
650 CALIFORNIA STREET
26TH FLOOR
SAN FRANCISCO, CA  94108
(415) 981-7210

22

FIRST AMENDED COMPLAINT FOR DAMAGES - Case No. 19-cv-03310-JSC

c.  Negligently, recklessly, and knowingly created the appearance that it was recommending and endorsing the Assailant, including by (1) making the UBER decal seem a reliable indicator of safety, (2) failing to secure its UBER decals generally, (3) providing UBER decals to the driver, and (4) failing to specifically recall its UBER decals from the driver once he proved to be dangerous.

105.  By virtue of the aforementioned acts, omissions, and breaches, Uber exposed Jane Doe to an unreasonable risk of harm, including the foreseeable harm of a kidnapping and/or assault.

106.  As a direct and proximate result of the aforementioned conduct and breach of duty, Jane Does has sustained and will sustain physical pain, mental suffering, loss of enjoyment of life, anxiety, humiliation, and emotional distress.

107.  As a direct and proximate result of the aforementioned conduct and breach of duty, Jane Doe has incurred economic damages, including lost past and future income, lost earning capacity, and past and future medical expenses.

Accordingly, Jane Doe is entitled to recovery against Uber in an amount to be determined at trial.

## PRAYER FOR RELIEF

A.  For noneconomic damages according to proof at trial;

B  For economic damages according to proof at trial;

C.  For costs of suit and attorneys' fees to the fullest extent permitted by law;

D.  For pre-judgment and post-judgment interest according to law;

E.  For punitive and exemplary damages in an amount that is sufficient to punish Uber and deter it and others from engaging in similar conduct in the future;

F.  For such other and further relief as the Court may deem proper.

LAW OFFICES OF
WALKUP, MELODIA, KELLY
& SCHOENBERGER
A PROFESSIONAL CORPORATION
650 CALIFORNIA STREET
26TH FLOOR
SAN FRANCISCO, CA 94108
(415) 981-7210

23

FIRST AMENDED COMPLAINT FOR DAMAGES - Case No. 19-cv-03310-JSC

1    Dated:  December 19, 2019                WALKUP, MELODIA, KELLY & SCHOENBERGER

2

3                                            By:    ___/s/ Sara M. Peters_____

4                                                   MATTHEW D. DAVIS

5                                                   SARA M. PETERS
                                                    ANDREW P. McDEVITT
6                                                   Attorneys for Plaintiff Jane Doe

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

LAW OFFICES OF
WALKUP, MELODIA, KELLY
& SCHOENBERGER
A PROFESSIONAL CORPORATION
650 CALIFORNIA STREET
26TH FLOOR
SAN FRANCISCO, CA  94108
(415) 981-7210

FIRST AMENDED COMPLAINT FOR DAMAGES - Case No. 19-cv-03310-JSC

**DEMAND FOR JURY TRIAL**

Plaintiff hereby demands a jury trial.

Dated:  December 19, 2019          WALKUP, MELODIA, KELLY & SCHOENBERGER

By:  ___/s/ Sara M. Peters___
MATTHEW D. DAVIS
SARA M. PETERS
ANDREW P. McDEVITT
Attorneys for Plaintiff Jane Doe

LAW OFFICES OF
WALKUP, MELODIA, KELLY
& SCHOENBERGER
A PROFESSIONAL CORPORATION
650 CALIFORNIA STREET
26TH FLOOR
SAN FRANCISCO, CA 94108
(415) 981-7210